UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x

WILLIAM WEINRAUCH,                          :

                              Plaintiff,    :

         -against-                          :

NEW YORK LIFE INSURANCE CO.,                :

                              Defendant.    :

----------------------------------------------------------x

```
┌─────────────────────────────────────────┐
│ USDC SDNY                                 │
│ DOCUMENT                                  │
│ ELECTRONICALLY FILED                      │
│ DOC #: _____                    │
│ DATE FILED:  1/16/2013                    │
└─────────────────────────────────────────┘
```

**REPORT AND**
**RECOMMENDATION TO**
**THE HONORABLE**
**PAUL A. CROTTY**

12 Civ. 5010 (PAC) (FM)

**FRANK MAAS,** United States Magistrate Judge.

        Pro se plaintiff, William Weinrauch ("Weinrauch") is an attorney.  In May 2005, he commenced this action in Supreme Court, New York County.  In his complaint, Weinrauch asserted several state law causes of action against defendant New York Life Insurance Company ("New York Life") arising out of a dispute about Weinrauch's entitlement to disability benefits under two individual insurance policies.  On June 25, 2012, New York Life removed the action to this Court on the theory that Weinrauch's state law claims relate to an employee welfare benefit plan and, therefore, are preempted by the Employee Retirement Income Security Act, 29 U.S.C. § 1001, et seq. ("ERISA").  (ECF No. 1).  Weinrauch has moved to remand the case to state court, contending that none of his claims relate to an ERISA plan, and that the suit was improperly removed.  (ECF No. 11).  For the reasons that are set forth below, that motion should be granted.

I.      Factual and Procedural Background[1]

        Between 1986 and 1993, Weinrauch was employed by RXR Capital

Management, Inc. ("RXR"), a financial services firm in Stamford, Connecticut.  (Pl.'s

Mem. at 1; Pl.'s Reply, Ex. C).  On October 1, 1987, RXR purchased an individual

disability income insurance policy for Weinrauch from New York Life.  (Pl.'s Mem. at 1;

Aff. of Mary Jones ("Jones Aff.") (ECF No. 14), Ex. I).  The policy was numbered

H3068548 (the "548 Policy") and had a monthly income benefit of $5,620.  (Pl.'s Mem.

at 1; Pl.'s Reply, Ex. N; Jones Aff. ¶¶ 2 n.1, 18).  RXR paid all of the premiums

associated with the 548 Policy under a list billing arrangement.  (Pl.'s Mem. at 1; Jones

Aff. ¶ 3).

        On June 4, 1992, RXR obtained a second disability policy (the "606

Policy") for Weinrauch through New York Life.  (Jones Aff., Ex. K).  There is a dispute

about how the 606 Policy was labeled initially.  Although Weinrauch acknowledges that

the policy number later changed to H3190606, he contends that the policy initially was

identified as C3190606.  (Pl.'s Mem. at 1).  New York Life maintains, however, that it

never issued policies with a "C" prefix, and that the 606 Policy always has been labeled

H3190606.  (Def.'s Mem. at 3; Aff. of Ernestine White ("White Aff.") (ECF No. 24) ¶ 6).

Whatever the prefix was at the time the 606 Policy was issued, it is undisputed that it had

---

[1]      The relevant background facts are derived from the parties' briefs and the
attached affidavits and exhibits.  (See Pl.'s Mem. in Supp. of Mot. to Remand ("Pl.'s Mem.")
(ECF No. 11); Def.'s Mem. in Opp. to Pl.'s Mot. to Remand ("Def.'s Mem.") (ECF No. 13);
Pl.'s Reply in Supp. of Mot. to Remand ("Pl.'s Reply") (ECF No. 17); Def.'s Sur-Reply in
Further Opp. to Pl.'s Mot. to Remand ("Def.'s Sur-Reply") (ECF No. 22)).

an initial monthly income benefit of $1,500, and that RXR again paid all premiums under a list billing arrangement.  (Pl.'s Mem. at 1; Jones Aff. ¶ 21-22, Ex. K).

   Weinrauch left his job at RXR on April 9, 1993.  (Pl.'s Mem., Ex. B).  That same day, Weinrauch met with James Rieger ("Rieger"), a New York Life agent based in Connecticut, who prepared an application requesting that New York Life "change the ownership" on the two policies to Weinrauch, and that the policies be removed from "List Bill #90577."  (Pl.'s Reply, Ex. D).  Thereafter, Weinrauch himself paid the premiums for both policies.  (See Pl.'s Mem., Ex. B).  A premium payment history indicates that after June 1, 1993, the "Premium Rate" on both policies was no longer listed as "NYL-A-PLAN," which was a group risk plan arrangement with RXR.  (See Jones Aff. ¶¶ 6, 9, Exs. J, L).  The payment history also reflects that the premiums for both policies changed after Weinrauch left his job.  (Jones Aff., Exs. J, L).

   On June 19, 1993, Weinrauch applied to New York Life for a "reduction in rating" and requested that the benefit term for both the 548 and 606 Policies be increased to age 65.  (Pl.'s Reply, Ex. G).  About one month later, on July 23, Weinrauch spoke with Joseph Bottega ("Bottega"), a disability underwriter at New York Life, who noted in Weinrauch's record that "we are willing to remove the extra premium and allow an age 65 benef[it] period; however, we need to place [an] exclusion rider on this policy because of [a] history of defective hearing for which applicant wears hearing aids."  (Pl.'s Reply, Ex. H) (block capitalization omitted).  On September 11, New York Life sent Weinrauch a bound policy book for the 606 Policy, which reflected that the benefit term was "to age

3

65 or 2 years, whichever is longer," and "one year, if total disability starts at or after age 75."  (Pl.'s Reply, Ex. E) (block capitalization omitted).

On or about September 17, 1993, Weinrauch submitted an application, requesting that the 548 Policy be upgraded to the "new disability income series."  (Pl.'s Reply, Ex. N).  In connection with that request, New York Life sent Weinrauch a number of documents, including a cover letter stating, "Enclosed is your new disability insurance policy. . . ," and an "Indorsements" page indicating that the new policy, Policy H2735166 (the "166 Policy"), had been issued "in exchange for" the 548 Policy.  (Pl.'s Reply, Ex. J).

On June 29, 1994, New York Life sent Weinrauch a letter notifying him that the monthly income benefit on the 166 Policy had been increased to $7,000 and that the "next scheduled increase" of $350 would occur on October 1, 1994.  (Pl.'s Reply, Ex. O).  The letter further stated that Weinrauch's current premium of $4,022.14 would be increased to $4,261.13.  (Id.).  Weinrauch's copy of the letter contains his handwritten notes of a conversation with Rieger on July 14, 1994, during which Rieger allegedly stated that the increase to $7,000 "includes [a] $350 [cost of living] increase for [the] next 5 years."  (Id.).

In March 2009, Weinrauch filed claims for total disability under both the 548 and 166 Policies.  (ECF No. 1, Ex. A ("Compl.") ¶ 3).  Thereafter, Weinrauch learned from New York Life that the policies also might have covered his prior partial disability.  (Id. ¶ 5).  Although New York Life agreed to make total disability payments, it

4

denied his request for retroactive partial disability payments, claiming that his notice was untimely.  (Id. ¶¶ 6-7).  Weinrauch contends that this denial was improper because a New York Life representative previously had told him that the 606 and 166 Policies did not cover partial disability.  (Id. ¶¶ 4, 8, 20-26).

On May 25, 2012, Weinrauch filed his pro se state court complaint, alleging, among other things, that New York Life breached its contractual obligations to him by denying his retroactive claim for partial disability benefits under the 606 and 166 Policies.  (Id. ¶¶ 19-26).  Weinrauch also alleged that New York Life made a number of wilful misrepresentations in communications with him regarding his disability policies. (Id. ¶ 27-34).

On June 25, 2012, New York Life removed this case to federal court, asserting that the "gravamen of [Weinrauch's] complaint relates to and concerns Weinrauch's claim for benefits under an employee welfare benefit plan within the meaning and intent of ERISA."  (ECF No. 1 (Notice of Removal) ¶ 4).  Weinrauch now seeks an order remanding the case to state court and awarding him the costs and fees he has incurred as a result of the removal.  (ECF No. 11).

II.   Discussion

A.   Legal Standard for Removal and Remand

The removability of civil actions commenced in state court is governed by 28 U.S.C. § 1441, which permits a case to be removed to federal court only if it "originally could have been filed in federal court."  Vera v. Saks & Co., 335 F.3d 109,

5

113 (2d Cir. 2003).  On a motion to remand, the "party seeking removal bears the burden of showing that federal jurisdiction is proper."  <u>Montefiore Medical Ctr. v. Teamsters Local 272</u>, 642 F.3d 321, 327 (2d Cir. 2011).  In deciding the motion, a court "must construe all disputed questions of fact and controlling substantive law in favor of the plaintiff."  <u>In re NASDAQ Market Makers Antitrust Litig.</u>, 929 F. Supp. 174, 178 (S.D.N.Y. 1996); <u>see</u> <u>also</u> <u>Wilds v. UPS Inc.</u>, 262 F. Supp. 2d 163, 171 (S.D.N.Y. 2003) ("the party seeking remand is presumed to be entitled to it unless the removing party can demonstrate otherwise").  Additionally, any doubts are to be resolved in favor of remand. <u>Lupo v. Human Affairs Int'l</u>, 28 F.3d 269, 274 (2d Cir. 1994).

B.   <u>ERISA Preemption of State Law Claims</u>

Ordinarily, under the "well-pleaded complaint" rule, "a defendant may not remove a case to federal court unless the <u>plaintiff's</u> complaint establishes that the case 'arises under' federal law."  <u>Franchise Tax Bd. of State of Cal. v. Const. Laborers Vacation Trust</u>, 463 U.S. 1, 10 (1983) (emphasis in original).  Preemption by federal statute – which is a defense to the plaintiff's suit and, hence, does not appear on the face of the complaint – is thus generally not a basis for removal.  <u>Metro. Life Ins. Co. v. Taylor</u>, 481 U.S. 58, 63 (1987).  Nevertheless, a state court lawsuit may properly be removed on preemption grounds "when a federal statute wholly displaces the state-law cause of action through complete pre-emption."  <u>Aetna Health Inc. v. Davila</u>, 542 U.S. 200, 207 (2004).  ERISA is such a statute.  <u>Id.</u> at 209 ("any state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with

6

the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted"); see also Grimo v. Blue Cross/Blue Shield of Vermont, 34 F.3d 148, 151 (2d Cir. 1994) ("Assertion of ERISA preemption permits removal of the beneficiary's case from state court, even if the complaint has pleaded only state law claims"); Smith v. Dunham-Bush, Inc., 959 F.2d 6, 10 (2d Cir. 1992) (state law breach of contract claim related to an employee benefits plan is preempted by ERISA).

The boundaries of ERISA's preemption of state law causes of action are set forth in 29 U.S.C. § 1144(a), which provides that ERISA "shall supercede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." The term "employee benefit plan" includes an "employee welfare benefit plan," which is defined under ERISA as "any plan, fund, or program . . . established or maintained by an employer . . . for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance . . . benefits in the event of . . . disability . . . ." 29 U.S.C. §§ 1002(1), (3). Thus, the propriety of New York Life's removal turns on whether the two disability insurance policies on which Weinrauch seeks to recover "relate to" an employee welfare benefit plan. See Dillon v. Metro. Life Ins. Co., 718 F. Supp. 2d 321, 325 (S.D.N.Y. 2010) ("Accordingly, where a claim styled as a state common law cause of action . . . 'relates' to an employee benefit plan within the meaning of [ERISA] . . . and falls within the scope of the statute's civil enforcement provisions, the action is removable") (internal citations, brackets, and quotation marks omitted). If so, the Court

must determine further whether Weinrauch's claims are sufficiently separate from that plan to permit him to proceed in state court.

C.      Existence of an ERISA plan

Although Weinrauch was the original owner of the 548 and 606 Policies, RXR clearly purchased them for him pursuant to an employee welfare benefit plan. See Mimbs v. Commercial Life Ins. Co., 818 F. Supp. 1556, 1559 (S.D. Ga. 1993) ("The threshold question is whether the insurance coverage provided to Gaston's employees was an 'employee welfare benefit plan' governed by ERISA"). "A plan, fund, or program, under ERISA is established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures from receiving benefits." Grimo, 34 F.3d at 151 (internal quotation marks and brackets omitted). "While the purchase of insurance does not conclusively establish a plan, fund, or program, the purchase of a group policy or multiple policies covering a class of employees offers substantial evidence that a plan, fund, or program has been established." Id. (internal quotation marks and ellipsis omitted).

In this case, RXR purchased Weinrauch's two original individual disability policies for him pursuant to a group risk arrangement with New York Life. During his employment, RXR paid the premiums on those policies and the initial paperwork listed RXR as the applicant. (See Jones Aff., Ex. C, F). The intended benefit under the policies was income protection in the event of an insured's disability. The beneficiaries of the plan were the employees for whom RXR purchased individual policies, and the source of

financing and procedures for receiving benefits are ascertainable from the policies themselves.  These facts all support the conclusion that the two original policies purchased for Weinrauch were, at least initially, obtained as part of an employee welfare benefit plan.

Weinrauch's counter-argument, which consists of a single sentence, cites Shearer v. Southwest Serv. Life Ins. Co., 516 F.3d 276 (5th Cir. 2008), for the proposition that the payment of insurance premiums by an employer is "not necessarily sufficient" to give rise to an ERISA employee benefit plan.  (Pl.'s Mem. at 2).  In Shearer, the plaintiff, a fifty-percent owner of the employer-company, purchased one insurance policy for himself and another for his mother, who was the other fifty-percent owner.  516 F.3d at 277.  For "bookkeeping purposes," the company paid the premiums for both policies.  Id. Because the company did not provide or pay for insurance policies for any other employees, the court found there was insufficient evidence of the company's intent to establish or maintain an ERISA plan for the benefit of its employees.  Id. at 277, 279-280.

Shearer is readily distinguishable from this case.  Here, there is evidence of a group risk billing agreement between RXR and New York Life, pursuant to which individual insurance policies were issued to certain employees, with RXR paying all of the premiums on those policies.  (See Jones Aff. ¶ 3).  Although Weinrauch was the owner of his two policies, he did not purchase them for himself; rather, they were purchased for him by RXR.  And since Weinrauch had no ownership interest in RXR, the agreement whereby RXR paid the premiums cannot be dismissed as a mere

9

"bookkeeping" arrangement.  In short, there is no indication that RXR lacked an intention to provide a benefit to its employees, or to establish an employee benefit plan, through its purchase of individual insurance policies and subsequent payment of the premiums.

Having determined that an employee welfare benefit plan existed, the remaining question is whether Weinrauch's disability coverage following his departure from RXR is sufficiently divorced from that benefit plan to remove the case from ERISA's purview.

D.    Applicability of ERISA to Weinrauch's Policies Post-Employment

In determining whether a former employee's individual insurance policy remains governed by ERISA, courts draw a distinction between "continuation" coverage and "conversion" coverage.  See, e.g., Waks v. Empire Blue Cross/Blue Shield, 263 F.3d 872 (9th Cir. 2001); Demars v. CIGNA Corp., 173 F. 3d 443 (1st Cir. 1999); Massachusetts Cas. Ins. Co. v. Reynolds, 113 F.3d 1450 (6th Cir. 1997); Painter v. Golden Rule Ins. Co., 121 F.3d 436 (8th Cir. 1997).  Continuation coverage is coverage mandated by the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), 29 U.S.C. § 1161 et seq., which allows former employees to elect to retain their same group health policy for a limited time after leaving their jobs.  See Local 217, Hotel & Rest. Emps. Union v. MHM, Inc., 976 F.2d 805, 809 (2d Cir. 1992); Radici v. Associated Ins. Cos., 217 F.3d 737, 740 (9th Cir. 2000).  To qualify as continuation coverage, the coverage under a continuation policy must be "identical" to the coverage provided under the original plan.  29 U.S.C. § 1162(1).  Because the coverage remains the same, the

former employee continues to belong to the group plan, and the employer retains certain ongoing administrative and financial obligations under the continuation policy, continuation coverage typically is governed by ERISA.  See Demars, 173 F.3d at 447; Mimbs, 818 F. Supp. at 1560-61.

A conversion policy, by comparison, is a private, non-employer-financed insurance policy that a former employee obtains through the exercise of conversion rights in a prior group policy.  Demars, 173 F.3d at 445 n.1; Eberlein v. Provident Life & Accident Ins. Co., No. 06-cv-02454-REB-MJW, 2008 WL 791944 (D. Colo. Mar. 20, 2008) (conversion coverage "generally refers to the right to convert group coverage provided under an ERISA plan to individual coverage").  It is a "new, separate policy . . . directly between the insurer and insured."  Waks, 263 F.3d at 876.  Although claims related to an employee's right to convert a group policy to an individual policy generally fall within the scope of ERISA, Howard v. Gleason Corp., 901 F.2d 1154, 1158 (2d Cir. 1990), "courts in [the Second Circuit], have repeatedly found that 'claims arising from the conversion policy itself are not preempted by [ERISA].'"  Dillon, 718 F. Supp. 2d at 326 (quoting Ziperski v. First Unum Life Ins. Co., No. 05 Civ. 7798 (DLC), 2006 WL 217928, at *2 (S.D.N.Y. Jan. 30, 2006) (emphasis in original)).  This is so because a converted policy is wholly separate from any previous ERISA plan and, unlike a continuation policy, the employer has no role in administering the conversion plan.  Crawley v. Oxford Health Plans, Inc., 309 F. Supp. 2d 261, 265-266 (D. Conn. 2004) (citing Waks, 263 F.3d at 876).

11

Weinrauch's two disability policies do not fall neatly into either category of coverage.  Although Weinrauch contends that his policies were "converted to individual policies" shortly after he left RXR, it is clear that he is wrong.  First, both of the original policies that RXR purchased were individual policies listing him (the "Insured") as the owner.  (Jones Aff., Exs. I & K).  Although Weinrauch submitted an application to New York Life seeking transfer of ownership over the two policies from RXR, (Pl.'s Reply, Ex. D), that request was unnecessary since he was the owner of those policies when they issued.[2]  (See White Aff. ¶ 5).  Moreover, while there were significant changes to Weinrauch's policies following his departure from RXR, there was no contractual conversion right under either policy since they were individual policies at the outset.  See Dillon, 718 F. Supp. 2d at 323 n.1 ("The right to convert a group plan into an individual one is conferred and governed by the terms of the group plan") (citing Howard, 901 F.2d at 1157).

New York Life contends that Weinrauch's disability policies should be treated as continuation coverage because they allegedly "continued in force, with the only change as a result of his leaving employment being that he assumed payment of the premiums instead of RXR."  (Def.'s Mem. at 12).  In advancing this argument, New York Life ignores the considerable changes that were made to both policies after Weinrauch

---

[2]      If Weinrauch were correct, RXR presumably would have had to have initiated (or at least approved) a transfer.  There is, however, nothing in the record to suggest that RXR ever was listed as the owner of any of the policies at issue, much less that any "transfer" of ownership occurred.

left RXR.  Among other things, the premiums for both policies changed, and payment

was no longer remitted through RXR pursuant to the "NYL-A-PLAN" group risk

arrangement.  New York Life also approved a reduction in rating and added an exclusion

rider to one of the policies due to Weinrauch's history of defective hearing.  The 548

Policy further was upgraded and assigned a different policy number as part of an

"exchange" of policies.  New York Life also sent out paperwork referring to Weinrauch's

"new disability income policy," and later increased the policy's monthly income benefit.

For these reasons, the coverage under Weinrauch's current policies bears little

resemblance to his coverage under the policies he previously owned during his

employment at RXR.  Since the current policies do not have the same features or terms as

his prior policies, they cannot be characterized merely as continuation coverage.  See,

e.g., Vincent v. Unum Provident Corp., No. 1:04-CV-340, 2005 WL 1074370, at *4 (E.D.

Tenn. May 5, 2005) (former employee's current policy deemed continuation coverage

because it provided "identical coverage under identical terms as initially acquired by

virtue of the previous employment relationship") (emphasis added).

       In advancing its continuation coverage argument, New York Life relies

extensively on Falcone v. Provident Life & Acc. Ins. Co., 651 F. Supp. 2d 760 (S.D. Ohio

2009).  There are, however, substantial factual differences between Falcone and this case.

In Falcone, the plaintiff was issued an individual disability insurance policy pursuant to

his employer's group plan arrangement.  Id. at 761.  The plaintiff had no part in the

negotiation of the policy's terms and the employer paid all of his premiums.  Id. at 762.

13

After leaving his employment, the plaintiff received a letter from his insurance company offering him an opportunity to purchase individual disability coverage at the same discounted rate that he had paid as a participant in his former employer's group plan. Id. at 763. The letter stated that the plaintiff could "continue [his] policy and retain the multi-life discount" without proof of good health. Id. The letter also indicated that the plaintiff's monthly benefit and policy number would remain the same. Id. The plaintiff responded to this offer by signing the carrier's letter underneath the statement "YES; I want to continue this coverage." Id. When the plaintiff's individual disability policy went into effect, there was no change in the terms or coverage from those of his previous policy. Id. Accordingly, because the "only difference" in the plaintiff's new policy was that the employer no longer remitted payment of his premiums, the court determined that the plaintiff's post-employment policy constituted continuation coverage governed by ERISA. Id. at 767. In arriving at that conclusion, the court found it significant that:

> (1) the Policy originated with an employee benefit plan; (2) the Policy had language providing the right to continue the Policy by the payment of premiums by the employee; (3) post-employment, the Policy had the same policy number as during employment; (4) post-employment, the Policy continued to benefit from the premium discount, and the premiums due under the Policy did not change; (5) post-employment, the terms of the Policy remained unchanged; and (6) post-employment, [the employer's] employee benefit plan continued to operate.

Id. at 769-770.

Here, unlike in Falcone, Weinrauch's policies changed considerably after his employment terminated. Among the differences in the terms of his current policies

were the addition of the exclusion rider, a reduction in rating, an increase in the monthly benefit, the removal of the policies from list billing at the "NYL-A-PLAN" group rate, and a change in premium for both policies. Additionally, the policy number of one of Weinrauch's policies changed as part of a policy "exchange," and, in connection with that transaction, New York Life issued materials referring to a "new" insurance policy, not a continued one. (See Pl.'s Reply, Ex. J). Moreover, although the 606 and 166 Policies may at one time have been part of an RXR employee benefit plan, there is nothing to suggest that Weinrauch continued to benefit from any list billing premium discount post-employment, unlike what had occurred in Falcone. See id. at 767. Thus, New York Life has failed to establish that many of the factors the court found crucial in Falcone, are present in this case.

New York Life further contends that any post-employment changes to Weinrauch's disability policies ought not to be considered because they were "administrative" adjustments that would have occurred even if Weinrauch had remained an RXR employee. (Def.'s Sur-Reply at 6). That conclusion, however, is based on the affidavit of Ernestine White, its Corporate Vice President, who provides no documentary support for her claim. (See White Aff. ¶ 4). White's conclusory assertion also is belied by the record before the Court. For example, the changes in Weinrauch's policy premiums, the reduction in rating, the addition of the exclusion rider, and the upgrade of the 548 Policy to a policy with different features and an entirely different number were not changes that would have occurred automatically; rather, as much of the paperwork

15

confirms, it was only at Weinrauch's express request that those changes were made.  (See Pl.'s Reply, Exs. D, F, G, I, J, N).  New York Life also has failed to explain why it reissued the 548 Policy as the 166 Policy if, as it contends, the very same policies remained "in force" after Weinrauch left RXR.  (See Jones Aff. ¶ 2 n.1).  Similarly unexplained is why New York Life would have sent Weinrauch information referring to his "new" policy if the policy was not new but, instead, the exact same policy that he had owned during his employment at RXR.

Even if New York Life's factual allegations were to be accepted, ERISA still would not control the case, because RXR has no role in the administration or maintenance of Weinrauch's current insurance policies.  It is, however, the employer's "ongoing administrative and financial involvement" that is the central consideration in gauging whether a policy is governed by ERISA.  Demars, 173 F.3d at 447; see also Eberlein, 2008 WL 791944, at *7 (describing the nature of the employer's ongoing financial and administrative relationship to the policy as the "key issue" in determining whether the plaintiff's disability policy was preempted by ERISA ); Ziperski, 2006 WL 217928, at *3 (finding no ERISA preemption where employer lacked any involvement in the administration of plaintiff's post-employment policy); Gatewood v. Life Ins. Co. of N. Am., 75 F. Supp. 2d 1347, 1349-1350 (M.D. Fla. 1999) (plaintiff's individual post-employment disability policy not subject to ERISA preemption because plaintiff's employer had no role in administering the policy).

As <u>Demars</u> explains, the preemption of state law claims must have a basis in ERISA's legislative purpose, which is to "safeguard employee interests by reducing the threat of abuse or mismanagement of funds . . . , while at the same time safeguarding employer interests by eliminating the threat of conflicting or inconsistent State and local regulation of employee benefit plans."  173 F.3d at 446 (citing <u>Fort Halifax Packing Co.</u> <u>v. Coyne</u>, 482 U.S. 1, 15 (1987), and <u>New York State Conference of Blue Cross & Blue</u> <u>Shield Plans v. Travelers Ins. Co.</u>, 514 U.S. 645, 656 (1995)).  When a former employer has no ties to the administration of the plan or management of funds, there is "no risk of [it] abusing or misusing [plan funds]."  <u>Id.</u>  Thus, "what matters for ERISA purposes is . . . the nature of the employer's ongoing administrative and financial ties to the policy. If no such ties exist, the policy should not be subject to ERISA regulation."  <u>Id.</u> at 450; <u>see</u> <u>also</u> <u>Eberlein</u>, 2008 WL 791944, at *7 (despite certain similarities to continuation coverage, plaintiff's individual disability policies were not preempted by ERISA because of former employer's lack of financial and administrative involvement).

Absent evidence that RXR retained any administrative or financial ties to either of Weinrauch's disability policies after he left RXR, there is no reason that ERISA should control the outcome of this case.  Weinrauch's state law causes of action consequently are not preempted.

     E.    <u>Attorneys' Fees and Costs</u>

Although Weinrauch's notice of motion makes a passing request pursuant to 28 U.S.C. § 1447(c) for an award of the costs and attorneys' fees associated with New

York Life's improper removal, (see ECF No. 11), none of his papers address this issue at all.  In any event, such an award would be improper for at least two reasons.  First, the Supreme Court has held, in the civil rights context, that pro se lawyers are not entitled to recover attorneys' fees under statutory fee-shifting provisions.  Kay v. Ehrler, 499 U.S. 432, 437 (1991).  "Although Kay was decided pursuant to section 1988 [of the Civil Rights Act of 1964], its reasoning is not confined to that statute," and the Second Circuit has "denied attorney's fees to pro se attorneys under a variety of fee shifting statutes . . . ."  Pietrangelo v. United States Army, 568 F.3d 341, 344 (2d Cir. 2009) (per curiam) (rejecting pro se litigant's attorneys' fee argument in a Freedom of Information Act case).  Weinrauch offers no explanation as to why a different result should obtain in this ERISA case.

Second, even if Weinrauch had retained counsel to represent him, the circumstances of this case do not support an award of attorneys' fees.  "Absent unusual circumstances courts may award attorney's fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal."  Martin v. Franklin Capital Corp., 546 U.S. 132, 141 (2005).  Moreover, the award of costs and fees is a matter "left to the discretion of the district court."  Bellido-Sullivan v. American Intern. Group, Inc., 123 F. Supp. 2d 161, 169 (S.D.N.Y. 2000) (citing Morgan Guar. Trust v. Republic of Palau, 971 F.2d 917, 924 (2d Cir. 1992)).  Here, there is no indication that New York Life's removal was objectively unreasonable or that it sought removal in bad faith.  See Allstate Ins. Co. v. CitiMortgage, Inc., No. 11 Civ. 1927 (RJS), 2012 WL

18

967582, at *8 (S.D.N.Y. Mar. 13, 2012) (denying plaintiffs' request for fees and costs where defendants demonstrated a "good faith" basis for removal).  New York Life removed the case on the theory that ERISA completely preempted Weinrauch's state law claims, which is a recognized basis for removal.  Although New York Life may ultimately prove unsuccessful in that endeavor, if Your Honor accepts my recommendation, it presented at least a colorable claim for removal.  Accordingly, Weinrauch's request for fees and costs should be denied.

III.    Conclusion

For the foregoing reasons, Weinrauch's motion should be granted and the case remanded to state court.  Additionally, fees and costs should not be awarded.

IV.     Notice of Procedure for Filing of Objections to this Report and Recommendation

The parties shall have fourteen days from the service of this Report and
Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule
72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a) and (e).  Any
such objections shall be filed with the Clerk of the Court, with courtesy copies delivered
to the chambers of the Honorable Paul A. Crotty, United States District Judge, and to
the chambers of the undersigned at the United States Courthouse, 500 Pearl Street, New
York, New York 10007, and to any opposing parties.  See 28 U.S.C. § 636(b)(1); Fed. R.
Civ. P. 6(a), 6(e), 72(b).  Any requests for an extension of time for filing objections must
be directed to Judge Crotty.  The failure to file these timely objections will result in a
waiver of those objections for purposes of appeal.  See Thomas v. Arn, 474 U.S. 140
(1985); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72(b).

SO ORDERED

Dated:     New York, New York
           January 15, 2013

_____
FRANK MAAS
United States Magistrate Judge

Copies to:

Hon. Paul A. Crotty (via hand delivery)
United States District Judge

William Weinrauch (via U.S. Mail)
2 Tudor City Place, Apt. 2BS
New York, New York 10017

Louis Philip DiGiaimo (via ECF)
McElroy, Deutsch, Mulvaney & Carpenter, LLP

20